FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
----------------------------------------------------------X

| | |
|---|---|
| In Re: | CHAPTER 11 |
| MICROBILT CORPORATION, *et al.* | Case No.: 11-18143 (MBK) |
| Debtor. | |

----------------------------------------------------------X

| | |
|---|---|
| MICROBILT CORPORATION and<br>CL VERIFY, LLC, | Adv. Pro. No. 12-01167 (MBK) |
| Plaintiffs, | |
| - v - | |
| FIDELITY NATIONAL INFORMATION<br>SERVICES, INC., CHEX SYSTEMS, INC.<br>and CERTEGY LTD., | |
| Defendants. | |

----------------------------------------------------------X

Bruce S. Luckman, Esq.
Michael J. Dube, Esq.
Sherman, Silverstein, *et al.*
308 Harper Drive, Suite 200
Moorestown, New Jersey 08057
*Special Litigation Counsel for MicroBilt Corporation*

Derek J. Baker, Esq.
Gary J. Ruckelshaus, Esq.
Brian M. Schenker, Esq.
Reed Smith LLP
136 Main Street, Suite 250
Princeton, New Jersey
*Attorneys for Chex Systems, Inc.*

**MICHAEL B. KAPLAN, U.S.B.J.**

**MEMORANDUM OF LAW**

I. **Introduction**

This matter is before the Court upon the motions ("Motions") of Chex Systems, Inc. ("Chex"), and Certegy Ltd, ("Certegy") (collectively "Defendants") seeking to dismiss the Plaintiffs' (defined below) Second Amended Adversary Complaint ("Complaint") and compel arbitration, consistent with the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. Alternatively, Defendants submit that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), incorporated in adversary proceedings pursuant to Fed. R. Bankr. P. 7012, for failure to state claims upon which relief can be granted. For the reasons set forth below, the Court determines that all of the claims asserted in the Complaint are subject to binding arbitration, and thus grants the Motions, without prejudice, to allow the parties to pursue arbitration in the appropriate forum.

II. **Jurisdiction**

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. By prior analysis, the Court has determined that Counts Three and Four (claims based on violations of the automatic stay) are core, within the meaning of 28 U.S.C. § 157(b)(2), while Counts One and Two (claims based on tortious interference) are non-core. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[1]

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### III.     Procedural History

MicroBilt, Inc. and CL Verify, LLC ("Plaintiffs" or "Debtors") are engaged in risk management information for small and medium sized businesses and are providers of alternative data for non-traditional lenders. MicroBilt provides online access to consumer and commercial credit bureau data with automated decisioning and collection services primarily to small and medium sized enterprises. Such enterprises use MicroBilt data and tools to facilitate credit originations, collect receivables, make lending decisions, screen employees, select tenants and manage business risk. MicroBilt provides these services (a) directly to the business, (b) by private label, and (c) by co-branded relationships. With its PRBC Consumer Report, and as the exclusive provider of the FICO Expansion Score, the Debtors provide alternative credit data to businesses that want to offer credit and financial services to the approximately 110 million underserved and under-banked individuals in the United States. The Debtors also sell proprietary comparative private-company financial information with its "Integra Data" on more than 4.5 million privately held companies collected from 32 governmental and non-governmental sources along with analytic tools. Integra users are lenders, CPAs, investment firms, valuation professionals and venture capitalists who use the data to value and benchmark the financial performance of non-public firms.

In August 2010, MicroBilt acquired CL Verify, a supplier of credit related information to on-line payday loan companies. CL Verify contains some legacy assets and liabilities from previous acquisitions. The majority of CL Verify's operating assets and liabilities have been absorbed by MicroBilt, and pursuant to the recently confirmed Fourth Amended Plan of Reorganization, CL Verify is to be merged and consolidated into the Reorganized Debtor MicroBilt.

On February 16, 2012, Plaintiffs commenced this adversary proceeding by filing a three-count Adversary Complaint against Defendants Fidelity National Information Systems, Inc. ("FIS"), Chex, and Certegy. FIS is a Georgia corporation with a principal place of business in Jacksonville, Florida. Chex is a Minnesota corporation with a principal place of business in Woodbury, Minnesota. FIS wholly owns and controls Chex and does business as "Chex Systems, Inc." Certegy is a business entity formed pursuant to the laws of the United Kingdom, with a principal place of business in England. Certegy is in the business of providing United Kingdom public records, historical consumer payment information, and related products and services.

In Counts One and Two, MicroBilt alleges that FIS and Chex tortiously interfered with existing and prospective contractual relationships. In Count Three, MicroBilt alleges that the Defendants violated the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362. On March 19, 2012, FIS and Chex filed a Rule 12(b)(6) motion to dismiss the Adversary Complaint.  After entertaining oral argument on April 23, 2012, the Court denied the motion to dismiss, in material part, without prejudice to Plaintiffs' amplification of the facts in an amended complaint. On April 24, 2012, Plaintiffs filed a First Amended Adversary Complaint adding the identities of the prospective end users lost due to the Defendants' alleged conduct. FIS and Chex filed a joint Answer on May 9, 2012. Certegy filed an Answer on August 14, 2012. Thereafter, on June 22, 2012, FIS and Chex sought a determination as to whether the claims in the First Amended Adversary Complaint were to be treated as "core" or "non-core," and also moved the District Court to withdraw the reference of this adversary proceeding. On July 16, 2012, the Court entertained oral argument and rendered a decision on the core/non-core issue. FIS and Chex' motion to withdraw the reference remains pending before the District Court.

On August 6, 2012, MicroBilt moved to amend the First Amended Adversary Complaint to add a proposed fourth count against FIS and Chex, alleging more recent violations of the automatic stay. On October 1, 2012, the Court approved the filing of the Second Amended Adversary Complaint. On October 15, 2012, FIS filed an answer to the Complaint (as defined above). On that same date, Chex and Certegy filed the within Motions.

## IV.    Factual Background

MicroBilt and Chex have a long-standing contractual relationship in which Chex sells financial information ("Information") to MicroBilt, who then resells the Information to end users, including lenders such as credit unions, payday lenders, and auto dealerships. MicroBilt also resells the Information through sales agents to their end users. A dispute arose under that long-standing contractual relationship with Chex which resulted in substantial litigation. Ultimately, the parties reached a settlement, which produced a Memorandum of Understanding on June 18, 2009, and a definitive Information Resale Agreement between the parties dated August 26, 2009, as amended in January of 2010 ("Resale Agreement").

On April 24, 2009, CL Verify entered into a "Data Reseller Agreement" ("DRA") with Certegy. By virtue of the DRA, Certegy agreed to supply exclusively to CL Verify certain consumer credit information that CL Verify would in turn resell to its end users, and to provide certain "call center services" and "sales support services." In exchange for exclusivity, CL Verify agreed to pay Certegy certain pricing per transaction, as well as a substantial guaranteed monthly minimum charge, regardless of actual data usage. Subsequently, on or around December 2, 2009, CL Verify UK Ltd., at the time a wholly owned subsidiary of CL Verify ("CLV UK"), and Certegy entered into a related "Independent Sales Organization Agreement" ("ISO Agreement"). By virtue of the ISO Agreement, Certegy agreed to participate in CLV UK-

sponsored product and sales training, actively and consistently market CLV UK's product within the United Kingdom, and fully cooperate with CLV UK in the development and marketing of CLV UK's product.

On or around August 31, 2010, through a series of corporate transactions, including a merger, MicroBilt acquired CL Verify. As part of the merger, CL Verify became a wholly-owned subsidiary of MicroBilt, and MicroBilt obtained hundreds of end users from CL Verify. On or around September 1, 2010, CL Verify executed a written assignment of assets, including the DRA, to MicroBilt, as specifically allowed by the provisions of that agreement. On or around the same date, CLV UK executed a written assignment of assets, including the ISO Agreement, to MicroBilt. As of September 1, the parties to the DRA and ISO Agreement were MicroBilt, on the one hand, and Certegy, on the other hand. By November 2010, the relationship between Chex and MicroBilt had deteriorated dramatically and Chex had asserted a series of defaults under the Resale Agreement, causing MicroBilt to file for Chapter 11 relief on March 20, 2011, in order to avoid the cessation of services by Chex. On March 23, 2011, CL Verify commenced a Chapter 11 case as well.

Plaintiffs allege that subsequent to the Chapter 11 filings, representatives of FIS/Chex directed Certegy to cease providing any support under the ISO Agreement because MicroBilt and CL Verify had filed for bankruptcy protection. Certegy allegedly acquiesced in this request. Plaintiffs contend that FIS/Chex gave Certegy (and Certegy accepted) this directive with the intent to maliciously cause MicroBilt and CL Verify financial harm. In this regard, and significantly, Plaintiffs assert that Defendants engaged in such wrongful conduct with the express aim of pressuring MicroBilt into renegotiating the pricing under the Resale Agreement.

Plaintiffs initially advanced three causes of action. Counts One and Two allege tortious interference with existing and prospective contractual relationships. In Count Three, Plaintiffs allege that Defendants' conduct, as described above, constitutes a willful, malicious, knowing, and intentional violation of the automatic stay, designed to harm MicroBilt and CL Verify for the purpose of obtaining an advantage in pricing negotiations. In Count Four of the Complaint, Plaintiffs allege that FIS/Chex undertook several additional post-petition actions in violation of the automatic stay provisions of the Bankruptcy Code.

Defendants principally argue that the Complaint should be dismissed in favor of arbitration. Chex bases its argument on ¶ 29 of the Resale Agreement between MicroBilt and Chex, which provides, in pertinent part: "Any dispute, difference, controversy or claim arising out of or relating to this Agreement shall be settled by binding arbitration … ." Certegy bases its argument on ¶ 8.1.1. of the ISO Agreement which requires that any dispute "arising out of any matter relating to or arising out of" the ISO Agreement should be determined through alternative dispute resolution. Likewise, the DRA between Certegy and CL Verify contains a comparable alternative dispute resolution clause. Alternatively, Defendants submit that the claims in the Complaint should be dismissed for failure to set forth sufficient factual underpinnings to support the tortious interference and willful stay violation claims.

**V.    Discussion**

This dispute presents the Court with an opportunity to address several intriguing substantive issues of law, among which are whether a corporate defendant can tortiously interfere with a contractual relationship between an affiliated corporate entity and a third party; or, whether (and to what extent) a party may be liable for willfully violating the automatic stay under 11 U.S.C. § 362(a) by reason of a post-petition breach of a contract with the debtor. To the

disappointment of the Plaintiffs, and with a measure of regret, this Court will forego the opportunity to weigh-in on these issues and will direct that the parties pursue the appropriate relief by means of arbitration.[2]

All claims asserted in the Complaint against Chex fall squarely within the broad purview of the arbitration clauses found in the Resale Agreement, ISO Agreement and DRA. Pertinently, in the Resale Agreement, Chex and MicroBilt agreed that "[a]ny dispute, difference, controversy or claim arising out of or relating to this Agreement shall be settled by binding arbitration. . . . " See Resale Agreement, ¶ 29. Likewise, in the ISO Agreement, Certegy and CLV UK agreed that "[a]ny dispute, difference, controversy or claim arising out of any matter relating to this Agreement shall be settled by binding arbitration. . . . " See ISO Agreement, pages 8-9. Similarly, in the DRA, Certegy and CL Verify agreed to a detailed non-judicial dispute resolution process for "any disagreement or dispute between the parties arising out of any matter relating to or arising out of this Agreement." See DRA, Art. 8.

The Court's analysis begins, where applicable, with the Federal Arbitration Act (the "FAA"), which establishes a strong federal policy in favor of arbitration by requiring that courts compel arbitration when an agreement so requires. 9 U.S.C. § 2. Indeed, recent pronouncements

---

[2] The Court rejects Plaintiffs' contention that there has been a waiver by either of the Defendants with respect to the right to seek arbitration of the claims asserted in the Complaint. As noted by Defendants in their submissions, the law in this Circuit falls decidedly against finding such waivers. "Consistent with the strong preference for arbitration in federal courts, waiver 'is not to be lightly inferred.'" PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068 (3d Cir. 1995) (quoting Gavlik Const. Co. v. H.F. Campbell Co., 526 F.2d 777, 783 (3d Cir. 1975)). Plaintiffs, as the parties asserting waiver, have the evidentiary burden to establish that a waiver occurred. See Great Western Mortg. Corp. v. Peacock, 110 F.3d 222, 233 (3d Cir. 1997). This litigation remains in its infancy, given the procedural maneuverings and judicial directives with respect to amendments of the Complaint. The parties have not progressed past the pleading stage. The Court can discern no prejudice to any party in enforcing the contractual arbitration rights at this juncture. Moreover, the Court is cognizant that the Resale Agreement was not assumed by the Debtors until September 7, 2012, and the Court finds persuasive the holding in In re Pester Refining Co., 58 B.R. 189, 191 (Bankr. S.D. Iowa 1985), which suggests that rights under an executory agreement [such as arbitration rights] cannot be enforced against a debtor in possession until the agreement is assumed. ("Pester's status as a Chapter 11 debtor-in-possession bars INA from enforcing a contractual provision against Pester unless and until Pester assumes the contract.").

by the U.S. Supreme Court serve to emphasize the respect our court should accord arbitration alternatives. See, e.g., Nitro-Lift Techs., L.L.C. v. Howard, 2012 U.S. LEXIS 8897, *7 (U.S. Nov. 26, 2012) ("Our cases hold that the FAA forecloses precisely this type of 'judicial hostility towards arbitration.'"); AT&T Mobility, 123 S. Ct. 1740 (2002) (citing Moses H.Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). Likewise, controlling decisions within the Third Circuit echo the deference directed to valid contractual arbitration provisions. See, e.g., Harris v. Green Tree Financial Corp., 183 F.3d 173, 178-79 (3d Cir. 1999) ("If . . . a court deems a controverted arbitration clause a valid and enforceable agreement, it must refer questions regarding the enforceability of the terms of the underlying contract to an arbitrator."); Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997), cert. denied, 522 U.S. 915 (1997) ("In conducting this inquiry the district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid.").

As noted by Defendants, the FAA applies to enforce written arbitration agreements in contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. In this regard, "commerce" is defined by the FAA to mean *"commerce among the several States or with foreign nations…….,"* 9 U.S.C. § 1. As to the dispute with FIS/Chex, clearly the FAA is applicable. Plaintiffs' pleadings make clear that the underlying transactions occurred between parties of different states: Chex is incorporated in and operates out of Minnesota; MicroBilt is a Delaware corporation with its principal place of business in New Jersey; CL Verify is a Florida LLC with its principal place of business in New Jersey. While there remains a question for the Court as to the applicability of the FAA with respect to transactions relative to the ISO Agreement and DRA, the policies underlying the FAA support application of the same analytical approach: (1) whether a valid agreement to arbitrate exists, and (2) whether the specific dispute falls within the

substantive scope of that agreement. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-28 (1985); Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110, 1114 (3d Cir. 1993). If this Court concludes that there is a valid agreement to arbitrate and the matter falls within the scope of the arbitration clause, it must refer the case to arbitration without reviewing the merits. See Paine Webber, Inc. v. Hartmann, 921 F.2d 507, 511 (3rd Cir. 1990).

Once it is established that a valid arbitration clause exists, the burden of establishing that the claims are unsuitable for arbitration rests on the Plaintiffs as the party opposing arbitration. See Green Tree Financial Corp.–Alabama v. Randolph, 531 U.S. 79, 91 (2000). Plaintiffs do not contest the existence or validity of the referenced arbitration provisions. Rather, Plaintiffs argue that the claims set forth in the Complaint neither arise out of nor relate to the contractual agreements. This Court disagrees and determines that Plaintiffs have not satisfied their burden to establish that the disputes fall outside the scope of the arbitration provisions. In this case, the Resale Agreement requires all claims **arising out of or relating to** the Resale Agreement to be arbitrated. See Resale Agreement, ¶ 29 (emphasis added). Likewise, in the ISO Agreement, Certegy and CLV UK agreed that "[a]ny dispute, difference, controversy or claim **arising out of any matter relating** to this Agreement shall be settled by binding arbitration. . . ." See ISO Agreement, pp. 8-9 (emphasis added). Similarly, in the DRA, Certegy and CL Verify consented to an alternative dispute resolution mechanism for "any disagreement or dispute between the parties **arising out of any matter relating to or arising out of this** Agreement." See DRA, Art. 8 (emphasis added).

The task facing this Court is to review the averments in the Complaint to discern whether the disputes arise out or relate to the referenced contractual agreements. In this regard,

10

"the court must consider the question in light of the allegations of the complaint, not the legal theories espoused." Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship), 277 B.R. 181, 198 (Bankr. S.D.N.Y. 2002) (citing Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 20-21 (2d Cir. 1995)). Additionally, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone, 460 U.S. 1, 24-25 (1983); see also Stateside Machinery Co., Ltd. v. Alperin, 591 F.2d 234, 240 (3rd Cir. 1979) ("Doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration"); Pfeiffer v. Dominion Management of Delaware t/a Cash Point (In re Pfeiffer), 2011 Bankr. LEXIS 3434, *13 (Bankr. E.D. Pa. Sept. 8, 2011) ("Doubts as to the scope of an arbitration agreement should be resolved in favor of arbitration.") (citing Granite Rock Co. v. International Brotherhood of Teamsters, 130 S.Ct. 2847, 2857 (2010)).

The gravamen of the Plaintiffs' claims in Counts One and Two are bottomed on the contention that Defendants acted with the intent to deprive MicroBilt of the economic benefits under the Resale Agreement, ISO Agreement and DRA, as well as to coerce MicroBilt into submission with respect to the ongoing pricing dispute under the Resale Agreement. The Court acknowledges that not all tortious interference claims or similar causes of action necessarily "arise out of" or "relate to" the agreements; however, in this matter, Defendants are not seeking to gain a competitive advantage in the market or drive the Plaintiffs from the industry for economic gain. Rather, Plaintiffs contend that the Defendants' actions have been undertaken to financially squeeze the Debtors and impel acquiescence to a favorable pricing scheme under the Resale Agreement. As stated by Plaintiffs:

> FIS and Chex believed that, if Certegy did not provide any support under the ISO Agreement, MicroBilt would still be required to make

> significant monthly minimum payments to Certegy under the Data Reseller Agreement without being able to generate any revenues in return. FIS and Chex further believed that this would cause MicroBilt financial harm, and cause MicroBilt to renegotiate pricing under the Information Resale Agreement.

[Plaintiffs' Objection, p. 10]. It is clear that the claims are very much related to the various agreements and fall within the scope of the respective arbitration provisions.

With respect to Counts III and IV, these claims seek recoveries for alleged violations of the automatic stay. As such, the analyses differ as to whether such claims are arbitrable. The language of the various agreements do not give any indication, either way, that the parties intended to include claims under the Bankruptcy Code. However, the mere fact that claims may arise under the Bankruptcy Code does not preclude application of the arbitration mandate. Rather, as Chex notes in its submissions, the proper inquiry is whether arbitration of such claims will "interfere with or affect the distribution of the estate." MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 109-110 (2d Cir. 2006) (citing Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.), 270 B.R. 99 (S.D.N.Y. 2001)); In re Pfeiffer, 2011 Bankr. LEXIS 3434, *15 (holding that fraudulent conveyance claim "is but a variant of the plaintiff's state court usury claim and falls within the scope of the parties' arbitration provisions).

The arbitration of Counts III and IV will not affect the administration of the Plaintiffs' bankruptcy estates. The disputed conduct did not allow Defendants either to acquire possession or control over Debtors' assets, or advance Defendants' interests over competing creditor constituencies.[3] Moreover, this Court recently confirmed the Debtors' Fourth Amended Plan of Reorganization, which provides for a 100% distribution to unsecured creditors, together with post-petition interest at the federal judgment rate. See Docket Nos. 567 and 708. The Plan

---

[3] To be clear, the Court does not suggest that intentional post-petition conduct geared towards depriving a debtor of valuable contractual rights cannot constitute a willful violation of the automatic stay; quite the opposite.

12

further provides for the assumption of all pertinent executory agreements. There is nothing in the record before the Court which suggests or evidences that arbitration of the stay violation claims will impede the administration of the bankruptcy estates or affect creditor recoveries. This Court does not regard arbitration of the claims in the Complaint to be inconsistent with the goals and objectives underlying the Bankruptcy Code, the Court's authority with respect to its orders, or the centralization of disputes involving bankruptcy issues.

The stay violations asserted against Defendants arise allegedly from actions and conduct that may give rise to causes of action for tortious interference, as discussed above, as well as post-petition breaches of contract relative to the Resale Agreement, ISO Agreement and DRA. As such, the stay violations are "inextricably intertwined" with claims that this Court deems arbitrable and therefore should be pursued collectively in arbitration. As recently stated by Judge Bernstein in TexStyle, LLC v. Harry Group, Inc. (In re TexStyle, LLC), 2012 Bankr. LEXIS 1676, at *27-28 (Bankr. S.D.N.Y. April 17, 2012):

> Finally, the stay violation claim is inextricably intertwined with the breach of contract claim under the Agreement, which is undeniably arbitrable. The Debtor alleges that "[t]he Defendant has willfully violated the automatic stay by attempting to maintain possession and control over the Debtor's Goods, which are property of the Debtor's estate." (Complaint at ¶ 34, p. 8.) These appear to be the same charges that underlie the claim that the Defendant breached the Agreement by failing to ship the Products to the customers or deliver the Products to Global One in a timely manner. The disposition of the Products is governed by the Agreement and the extent of any violative conduct may coincide with any breach of contract by the Defendant. Put differently, if the Defendant shipped or did not ship or deliver Products in accordance with the Agreement, it is hard to see how it could be liable for a violation of the automatic stay.

Plaintiffs note in their submissions that even if the Court were to grant dismissal of certain counts by reason of the arbitration requirements, there remain other parties and residual claims which must be addressed by this Court as part of this pending action, including the

Plaintiffs' identical claims against FIS and all of CL Verify's claims. Plaintiffs posit that the wholesale dismissal of the Complaint would be inappropriate. Given, however, that these claims are inextricably linked, both factually and by virtue of the legal contentions raised therein, with the claims to be arbitrated, this Court regards a continuation of this litigation to be an undue burden on judicial resources and opts to abstain *sua sponte* from hearing the remaining claims.

It is well-settled that a court may raise the issue of abstention *sua sponte*. In re Strano, 248 B.R. 493, 503 (Bankr. D. N.J. 2000). The decision whether to abstain falls within sound discretion of the court. In re Asousa P'ship, 264 B.R. 376, 391 (Bankr. E.D. Pa. 2001). Even where it has jurisdiction, a bankruptcy court is not compelled to hear a case; the court may, in its discretion, abstain from hearing the matter. In re P & G Realty Corp., 157 B.R. 239, 242 (Bankr. W.D. Pa. 1993).

Abstention in the bankruptcy court is governed by 28 U.S.C. § 1334(d) and 11 U.S.C. § 305(a), which confer discretion upon bankruptcy courts to dismiss or suspend an action should such decision better the interests of the parties. In re A & D Care, Inc., 90 B.R. 138, 141 (Bankr.W.D. Pa. 1988). To determine whether permissive abstention is appropriate, courts apply a variety of factors, including the following:

> (1) the court's duty to decide what is before it; (2) the effect on the efficient administration of the estate if the court abstains; (3) the possibility of inconsistent results stemming from the abstention; (4) the waste of judicial resources; (5) the presence of difficult or unsettled areas of state law more properly addressed in a state forum; (6) considerations of comity; (7) prejudice to any non-debtor party from proceeding in federal court; (8) the extent to which state law issues predominate over bankruptcy issues; (9) the presence of a related proceeding commenced in state court; (10) jurisdictional basis other than 28 U.S.C. § 1334; (11) how related the case is to the main bankruptcy case; (12) the substance of a "core" proceeding; (13) the feasibility of severing state law claims from the bankruptcy case; (14)

the burdens to the court's docket; (15) the existence of a right to a jury trial; and (16) the presence of non-debtor parties in the case.

In re Strano, 248 B.R. 493, 504 (Bankr. D. N.J. 2000). After considering these factors—namely the remoteness of the proceeding to the administration of the main bankruptcy case, the substantive non-bankruptcy issues in dispute, the relative ease in which the parties could address the issues in a non-judicial forum, the interests of judicial economy, and the burden to the Court's docket—the Court will abstain from adjudicating the remaining claims, and concludes that abstention best serves the interests of the parties and the Court.

## VI. Conclusion

For the reasons set forth above, the Court grants the Motions to Dismiss and directs the parties to proceed to arbitration before the appropriate tribunals. The Court further permissively abstains from hearing the balance of the claims in the litigation. Counsel for Defendants is directed to submit proposed orders under the seven (7) day rule.

_/s/ Michael B. Kaplan_
Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: December 11, 2012